# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

|  |  |  |
|---|---|---|
| SUSAN K. LOCHRIDGE, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:04CV661 |
| CITY OF WINSTON-SALEM, | ) ) ) | |
| Defendant. | ) ) ) ) | |

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the court on Defendant's motion for summary judgment [docket no. 13]. Plaintiff has responded to the motion, and the matter is ripe for ruling. The parties have not consented to the jurisdiction of a magistrate judge; therefore, the court must deal with the motion by way of a recommendation. For the reasons which follow, the court will recommend that Defendant's summary judgment motion be granted.

**PROCEDURAL HISTORY**

After being terminated from her employment with Defendant City of Winston-Salem ("the City"), Plaintiff filed this lawsuit, asserting the following claims: (1) a claim for failure to accommodate and for wrongful termination under the American with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and (2) a claim under the

Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq., asserting that the City denied Plaintiff her rights under the Act. Defendant has filed a motion for summary judgment as to all claims.

**FACTS**

Plaintiff began her employment with the City as a full-time Computer Programmer in September 1984. Pl.'s Dep. p. 15. She was later promoted to Programmer Analyst and eventually to Systems Analyst. She was transferred to a part-time Systems Analyst position in March 2003 and was suspended in January 2004 due to chronic absenteeism and resulting poor work performance. The undisputed evidence shows that Plaintiff received positive reviews for her work during much of her tenure with the City. In 2001, however, Plaintiff's performance reviews began to reflect that her frequent absences were negatively affecting her work. For instance, Plaintiff's performance evaluation for the period March 2000 to March 2001 describes Plaintiff as a "competent, dependable and productive" analyst, but it also states that "an area that [plaintiff] needs to improve is in [a]ttendance and [p]unctuality." Pl.'s Dep. pp. 33-37 & Def.'s Ex. 5; Kureczka Aff. ¶ 6. Furthermore, Plaintiff's performance evaluation for the period March 2001 to March 2002 notes an "acceptable" performance in Plaintiff's quality of work and knowledge of work, but Plaintiff was given a rating of "unacceptable" in the areas of customer service, initiative, completion of tasks, and attendance/punctuality. Furthermore, the summary of the evaluation states, in part:

> Attendance has been a long-term problem and noted in prior performance reviews. During the time period of this evaluation, Susan's attendance has become unacceptable and has severely impacted her customer service, initiative, and completion of tasks.

Def.'s Ex. 6. Plaintiff's performance evaluation for the July 2001 to June 2002 time period also reflects Defendant's concerns about her chronic absenteeism. Pl.'s Dep. p. 49 & Def.'s Ex. 9. Specifically, Plaintiff was given the worst possible rating in the "ethics/integrity" and "results orientation" categories. Def.'s Ex. 9; Kureczka Aff. ¶ 9. Furthermore, the evaluation states:

> [Plaintiff's] health problems have caused excessive time away from work. Her reduced delivery of work output and delays in the completion of assignments have had a negative impact on service to her customers. This in turn impedes the customer's ability to serve the citizen.

Def.'s Ex. 9.

In March 2002, because of Plaintiff's chronic absenteeism, one of Plaintiff's superiors reminded Plaintiff of the availability of FMLA leave and suggested that she apply for such leave. Pl.'s Dep. p. 52. On March 19, 2002, Plaintiff requested leave based on inability to do her job due to a serious health condition. Def.'s Ex. 11. In the certifications provided by Plaintiff's health care providers, the "medical facts" supporting Plaintiff's request for leave were that Plaintiff was having a "rough time" with depression; that Plaintiff had diabetes "which needs regular follow up"; and that Plaintiff suffered from "generalized anxiety disorder." Pl.'s Dep. pp. 52-55 & Def.'s Ex. 12. On April 5, 2002, Plaintiff was approved to be out on intermittent leave retroactive to March 7, 2002. Pl.'s Dep. pp. 57-58 & Def.'s Ex. 14.

3

Plaintiff's intermittent FMLA leave lasted from March 7, 2002, to January 16, 2003, at which point Plaintiff had used up her full 12 weeks of leave. After Plaintiff's leave expired in January 2003, however, Plaintiff continued to miss work. Pl.'s Dep. pp. 59-60, 63. On around March 10, 2003, Plaintiff's senior supervisor, Thomas Kureczka, advised her that she had exhausted her FMLA leave. He further informed her that because of her chronic absenteeism she was being transferred from a full-time to a part-time position. Pl.'s Dep. pp. 62-64 & Def.'s Ex. 15; Kureczka Aff. ¶¶ 8, 9. The transfer reduced Plaintiff's work week from 40 to 30 hours with a resulting decrease in pay. Pl.'s Dep. pp. 63-64; Kureczka Aff. ¶ 8. Kureczka also presented Plaintiff with a memo titled "Work Performance Plan/Notice of Attendance Requirements and Issues." Pl.'s Dep. pp. 62-63 & Def.'s Ex. 15; Kureczka Aff. ¶ 9. The memo advised Plaintiff of her transfer to the part-time position "due to issues related to [her] unavailability to work" and informed her that she had exhausted her 12 weeks of FMLA leave as of January 16, 2003. Def.'s Ex. 15. The memo further stated that Plaintiff's "present leave balances show no accrued time for holiday, sick, and vacation leave"; reminded Plaintiff that she was "expected to meet the performance and attendance requirements of [her] position"; and advised her that her "role as Systems Analyst is essential to the daily operations and support of [the City's] production systems and services." Def.'s Ex. 15. Finally, the memo advised Plaintiff that in light of her "absenteeism and the impact it has on your ability to perform your work," she would now be evaluated on a three-month (rather than

4

yearly) basis and that any performance issues at the next performance review "will be addressed with disciplinary action." Pl.'s Dep. pp. 62-67 & Def.'s Ex. 15. Plaintiff signed the memo acknowledging that she had received and understood it. Def.'s Ex. 15.

Despite the admonitions from Defendant regarding her absenteeism, Plaintiff's attendance did not improve. Plaintiff's performance evaluation for the period from July 2002 to June 2003 included the following comments:

> Susan has demonstrated the skills required to perform her job assignments in a generally competent manner while at work. The main problem and issue this past year has been her time not at work. Her absenteeism reached a point where she exhausted all sick, holiday, and vacation leave, and all leave available from an approved FMLA request. To address this problem Susan was laterally transferred to a part time position and expected to work a minimum 30 hours per week. Susan was then working four days per week, with the days worked each week varying based on project schedules, production support needs, and Susan's personal needs. This led to project scheduling issues and conflicts. Project leaders were having trouble scheduling her activities and supervisors were juggling the assignments of other's [sic] that backup Susan on her days out. To address this we recently have set Susan's work schedule to a fixed Monday through Thursday. It is hoped that this will allow Susan to meet her work requirements and management to more effectively and efficiently schedule her assignments in regards to our work plan.

Pl.'s Dep. pp. 69-70 & Def.'s Ex. 19.

In the latter part of 2003, the City's Information Services ("IS") Department was working on a large project called the Hansen Project, which involved the conversion of the building inspections database from the old mainframe system to the new client-server system. Pl.'s Dep. pp. 72-73, 76; Kureczka Aff. ¶ 12. The

5

Hansen Project was a primary focus of the IS Department during that time, and its successful completion was important to the City. Milam Aff. ¶ 4. As of December 2003, the IS Department wanted to finish the Hansen Project as soon as possible. Pl.'s Dep. pp. 100-01; Kureczka Aff. ¶ 12. Plaintiff's specific assignment for the Hansen Project was to write a program to extract data from the old mainframe computer system. Pl.'s Dep. pp. 75-77; Kureczka Aff. ¶ 13. According to Plaintiff's own admission, her assignment was "important" and "critical." Pl.'s Dep. p. 77. When she was given her assignment in November 2003, Plaintiff told her supervisors that she estimated that it would take her eight hours to complete. Pl.'s Dep. pp. 75-77; Kureczka Aff. ¶ 13. Plaintiff was out sick starting on Wednesday, December 10, 2003, until she returned to work on Monday, December 22, 2003. Pl.'s Dep. p. 79. Plaintiff testified that she had a viral infection during this time. Pl.'s Dep. pp. 83-84. When Plaintiff took sick leave beginning December 10, 2003, she had not finished her work on the Hansen Project. Pl.'s Dep. p. 78.

On December 18, 2003, Kureczka called Plaintiff at home to discuss her progress on the Hansen Project. Kureczka Aff. ¶ 14. Plaintiff told Kureczka that she had still not completed the project and that it would take her about eight more hours for her to complete her work. Pl.'s Dep. pp. 87-88; Kureczka Aff. ¶ 14. Plaintiff told Kureczka that she would return to work on December 22, 2003, and that she would complete her assignment on the Hansen Project as soon as possible upon her return. Pl.'s Dep. p. 88; Kureczka Aff. ¶ 14. During that same telephone

6

conversation, Kureczka told Plaintiff that she had exhausted her leave time and that the City's human resources department would be mailing FMLA paperwork to her in case she wanted to request FMLA leave. Pl.'s Dep. pp. 86-87; Kureczka Aff. ¶ 15. Plaintiff received the FMLA paperwork on December 22, 2003. Pl.'s Dep. p. 87.

Plaintiff returned to work on December 22, 2003, and December 23, 2003. Pl.'s Dep. pp. 88-89, 92, 97. During these two days of work, however, Plaintiff still did not finish her Hansen Project assignment even though she had been told it was her top priority. Pl.'s Dep. p. 90; Kureczka Aff. ¶ 14. On December 23, 2003, Plaintiff asked her immediate supervisor, Alice Milam, if she could take off the following day, Wednesday December 24, 2003. Pl.'s Dep. pp. 90-91; Milam Aff. ¶ 8. Milam, not knowing about Plaintiff's earlier conversation with Kureczka about the urgent need for Plaintiff to complete the Hansen Project assignment, allowed Plaintiff to take off December 24, 2003. Pl.'s Dep. p. 91; Milam Aff. ¶ 8.

On December 24, 2003, Milam spoke by telephone with Kureczka, who told Milam about his earlier conversation with Plaintiff about the urgency of finishing the Hansen Project. Milam Aff. ¶ 9. On December 26, 2003, Milam called Plaintiff at home. Plaintiff testified that Milam was "upset that the Hansen work wasn't completed." Pl.'s Dep. pp. 92-93. Milam emphasized to Plaintiff that her assignment was a critical part of the Hansen Project. Pl.'s Dep. p. 94; Milam Aff. ¶ 9. Plaintiff told Milam that she would return to work Monday, December 29, 2003, and that she would complete the assignment as soon as possible after she returned to work. Pl.'s

7

Dep. pp. 93-94; Milam Aff. ¶ 10. Plaintiff did not, however, return to work that following Monday. Instead, she called in sick. She also called in sick the next two days, Tuesday December 30 and Wednesday December 31. Pl.'s Dep. pp. 94-95. Plaintiff testified that she was absent on these days because she had a relapse of her viral infection. Pl.'s Dep. p. 95. The next day, Thursday January 1, 2004, was an office holiday, and Plaintiff again called in sick on Friday January 2, 2004. Thus, Plaintiff did not report to work at all during the week of the New Year holiday.

On January 5, 2004, Plaintiff was suspended, pending termination, for violating the City's attendance policy. Pl.'s Dep. p. 102; Kureczka Aff. ¶ 17. The City's Disciplinary Action Report, which was given to Plaintiff on January 5, 2004, states that Plaintiff was being suspended, pending a "hearing on action for dismissal," for her violation of the City's personnel policy concerning "attendance policies–poor attendance; absence without justifiable cause, or habitual tardiness." Pl.'s Dep. pp. 102-04 & Def.'s Ex. 28. The report also stated:

> Susan has demonstrated poor attendance for a significant period of time, well over two years. Last year she was transferred into a part-time position to remove some of the dependencies of her contributions to the staff projects and support activities. Her attendance this past year has not improved, and she has not been able to deliver the work expected and required in even a part-time position. We continue to shuffle her work assignments to other staff, and have been burdened with using outside contractors to complete her work on critical projects.

Pl.'s Dep. pp. 102-105 & Def.'s Ex. 28. On January 9, 2004, Plaintiff filed a grievance with the City. Pl.'s Dep. p. 105 & Def.'s Ex. 29. Also on January 9, 2004, four days after she was suspended pending termination, Plaintiff submitted an

8

untimely request for FMLA leave, seeking intermittent FMLA leave to begin, retroactively, on December 11, 2003, and to end on December 10, 2004. Pl.'s Dep. pp. 108-09 & Def.'s Ex. 31. The medical certification submitted in support of Plaintiff's FMLA request indicated that the "medical facts" supporting her request were that Plaintiff had allergic rhinitis and asthma that caused coughing and that Plaintiff had diabetes mellitus requiring regular office visits. Pl.'s Dep. pp. 108-11 & Def.'s Ex. 32. The City denied Plaintiff's FMLA request because the request was untimely and because Plaintiff had already been suspended pending termination when she submitted the request. Clark-Bell Aff. ¶¶ 4, 5.

On February 3, 2004, Assistant City Manager Gregory Turner presided over a hearing on Plaintiff's grievance with the City. Pl.'s Dep. pp. 107-08; Stuart Aff. ¶ 5. Based on the information presented to him at the grievance hearing, Turner recommended to the City Manager, Bryce Stuart, that Plaintiff be discharged for violating the City's attendance policies. Stuart Aff. ¶ 6. Thereafter, the City Manager reviewed Turner's recommendation, along with Plaintiff's personnel and attendance records, and decided to uphold the termination of Plaintiff's employment due to Plaintiff's violation of the City's attendance policies. Stuart Aff. ¶ 6. On or about February 17, 2004, Plaintiff received a letter from the City Manager advising her that he had upheld the action of the IS Department to terminate her employment immediately. Pl.'s Dep. p. 108 & Def.'s Ex. 30.

**DISCUSSION–STANDARD OF REVIEW**

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Zahodnick v. International Bus. Machs. Corp.*, 135 F.3d 911, 913 (4th Cir. 1997). The party seeking summary judgment bears the burden of initially coming forward and demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate that there is a genuine issue of material fact which requires trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a fact-finder to return a verdict for that party. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250 (1986); *Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 817 (4th Cir. 1995). Thus, the moving party can bear his burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish his claim. *Celotex Corp.*, 477 U.S. at 331 (Brennan, J., dissenting). When making the summary judgment determination the court must view the evidence, and all justifiable inferences from the evidence, in the light most favorable to the non-moving party. *Zahodnick*, 135 F.3d at 913; *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196 (4th Cir. 1997).

Plaintiff's ADA Claims Based on Wrongful Termination and Failure to Accommodate

Plaintiff first alleges that Defendant failed to accommodate her "disability" under the ADA and that she was unlawfully discharged because of her "disability." A claim for unlawful termination and a claim for failure to make a reasonable accommodation under the ADA both require a showing that Plaintiff was "disabled" within the meaning of the ADA.[1] *See Rhoads v. FDIC*, 257 F.3d 373, 387 (4th Cir. 2001); *Gallimore v. Newman Mach. Co.*, 301 F. Supp. 2d 431, 441 (M.D.N.C. 2004). The ADA defines a "disability," in part, as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A); *see also* 29 C.F.R. § 1630.2(g). Examples of "major life activities" include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(j). As the Supreme Court has explained:

> "Major life activities" thus refers to those activities that are of central importance to daily life. In order for performing manual tasks to fit into this category–a category that includes such basic abilities as walking, seeing, and hearing–the manual tasks in question must be central to daily life.

*Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197 (2002). The Supreme Court has further made clear that a person does not qualify as "disabled" simply by

---

[1] Under the ADA, discrimination includes not making reasonable accommodations for the known physical or mental limitations of an otherwise qualified individual with a disability, unless the employer can demonstrate that the accommodation would impose an undue hardship on the business. 42 U.S.C. § 12112(b)(5)(A).

submitting evidence of a medical diagnosis of an impairment. *See id.* at 198. Rather, an individual must offer evidence that the limitation caused by the impairment "prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives," and that the impact of the impairment is permanent or long-term. *Id.* The determination of whether a person is disabled is an individualized inquiry, particular to the facts of each case. *See Sutton v. United Air Lines*, 527 U.S. 471, 483 (1999). Finally, whether a plaintiff is disabled "is a question of law for a court, not a question of fact for a jury." *Hooven-Lewis v. Caldera*, 249 F.3d 259, 268 (4th Cir. 2001).

In her complaint, Plaintiff alleges that up until 2000, she developed health problems which became increasingly disabling, causing an attendance problem at work, and that she has diabetes, asthma, and allergy/respiratory problems. *See* Pl.'s Compl. ¶¶ 8(c) and 8(d). Plaintiff characterizes these health problems as a "disability" and contends that the combination of these conditions qualifies as a physical disability. As noted above, the Supreme Court has made clear that "[m]erely having an impairment does not make one disabled for purposes of the ADA." *Toyota Motor Mfg.*, 534 U.S. at 195. Here, the undisputed evidence shows that Plaintiff's health problems–diabetes, asthma, and allergies–do not substantially limit one or more of her major life activities sufficient to constitute a disability under the ADA. Plaintiff testified in her deposition that she is able to take care of herself, and she even admitted that she is able to work. Pl.'s Dep. p. 118. Furthermore,

Plaintiff admits she is able to perform all major life activities, such as caring for herself, performing manual tasks, seeing, hearing, speaking, breathing, learning, and working. Pl.'s Dep. p. 118. She fails to identify any major life activities that are impaired and admits that her allergies, asthma, and diabetes "do not really stop her from doing anything that she wants to do." Pl.'s Dep. p. 122. Plaintiff also admits that her long-time personal physician, Dr. Record, who has treated her for diabetes, allergies, and asthma, has told her that these conditions did not prevent her from working. Pl.'s Dep. p. 120. Plaintiff also stated in her deposition that Dr. Record has told her that she was not disabled, and she stated that she did not disagree with his assessment. Pl.'s Dep. pp. 120-21. In sum, by her own deposition testimony, Plaintiff has admitted that she suffers from no physical or mental impairment that substantially limits one or more of her major life activities. Thus, the court finds that as a matter of law, Plaintiff is not disabled within the meaning of the ADA, and the court should, therefore, grant summary judgment to Defendant on her claims under the ADA for failure to make reasonable accommodations and unlawful discharge.[2]

In any event, even if Plaintiff could show that she was disabled, she has not established a prima facie case for either failure to accommodate or for wrongful discharge under the ADA. To establish a prima facie case of failure to

---

[2] Furthermore, to the extent that Plaintiff suggests in her brief opposing the summary judgment motion that Defendant regarded her as substantially limited in the major life activity of working, thus qualifying her as disabled under 42 U.S.C. § 12102(2)(C), the court finds that, even construing the evidence in a light most favorable to Plaintiff, the record simply does not support this assertion.

accommodate, a plaintiff must show the following: (1) that she is an individual who has a disability within the meaning of the statute; (2) that the employer had notice of her disability; (3) that with reasonable accommodation she could perform the essential functions of her job; and (4) that the employer refused to make such accommodations. *Rhoads*, 257 F.3d at 387 n.11. Plaintiff has produced no evidence showing that she required any reasonable accommodations in order to be able to perform the essential functions of her position or that the City refused to make such accommodations. Accordingly, Plaintiff cannot demonstrate a prima facie case for failure to make reasonable accommodations under the ADA.

As for Plaintiff's wrongful discharge claim, to establish a prima facie case of wrongful discharge under the ADA, a plaintiff must show that (1) she is within the ADA's protected class; (2) she was discharged; (3) at the time of her discharge, she was performing the job at a level that met her employer's legitimate expectations; and (4) her discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. *Rhoads*, 257 F.3d at 387 & n.11. Here, even if Plaintiff could show that she was within the ADA's protected class, i.e., that she is disabled within the meaning of the ADA, she has not produced evidence raising a genuine issue of fact as to whether she was performing her job at a level that met her employer's expectations. As noted above, the undisputed facts show that Defendant had repeatedly noted in Plaintiff's performance reviews that Plaintiff's chronic absenteeism was resulting in work performance that was not meeting

14

Defendant's expectations. Because of Plaintiff's chronic absenteeism, Defendant had already reduced her workload from a full-time to a part-time position. Furthermore, Defendant repeatedly warned Plaintiff in performance reviews and memos that her absenteeism was detrimentally affecting her job performance and that further unjustified absences could result in disciplinary action. In opposing Defendant's motion for summary judgment, Plaintiff has submitted an affidavit by one of her supervisors, Stanley Trawick, who states that between 2000 and 2002 he wrote all but one of Plaintiff's evaluations and that in each of these evaluations Plaintiff's work performance was acceptable and in some cases exceptionally good, but that all of the performance evaluations also mentioned a need for improvement in punctuality and attendance. Trawick Aff. Trawick further asserts in the affidavit that the last performance evaluation he wrote for Plaintiff was in 2002, that management rejected it, and that under duress he was required to present a replacement evaluation as his own, which was not part of the City's standard procedure.

    The court finds that Trawick's affidavit does not raise a genuine issue of material fact as to whether Plaintiff was performing according to Defendant's legitimate expectations sufficient to overcome Defendant's summary judgment motion. The undisputed facts show that from 2002 until Plaintiff's termination, her performance evaluations continued to note her chronic absenteeism and her resulting poor work performance. As noted, even Trawick concedes in his affidavit

15

that the performance evaluations conducted by him mentioned a need for improvement in punctuality and attendance. Thus, even if Plaintiff had shown that she was suffering from a disability within the meaning of the ADA, which she has not, this one affidavit submitted by Plaintiff, in the face of all of the other undisputed evidence of her chronic absenteeism, is not enough to raise an issue of material fact as to whether she was performing her job at a level that met Defendant's expectations. As this circuit's court of appeals has stated:

> In addition to possessing the skills necessary to perform the job in question, an employee must be willing and able to demonstrate these skills by coming to work on a regular basis. Except in the unusual case where an employee can effectively perform all work-related duties at home, an employee "who does not come to work cannot perform *any* of his job functions, essential or otherwise." An employee who cannot meet the attendance requirements of the job at issue cannot be considered a "qualified" individual protected by the ADA.

*Tyndall v. National Educ. Ctrs., Inc.*, 31 F.3d 209, 213 (4th Cir. 1994) (citations omitted) (emphasis in original), *construed in Rohan v. Networks Presentations LLC*, 375 F.3d 266, 279 (4th Cir. 2004) ("[P]laintiff [in *Tyndall*] failed to perform essential function of attendance because her absences made her incapable of fulfilling her teaching obligations."). Here, Defendant has shown that it maintained a regular attendance policy, and Plaintiff did not adhere to this policy, thus resulting in poor work performance during at least the last two years of her employment, and which culminated in her failure to complete an important assignment (the Hansen Project). Thus, the court finds that Defendant has demonstrated that there is no genuine issue of fact as to whether, in terminating Plaintiff's employment, Defendant violated the

ADA, and it will be recommended that the court grant summary judgment on Plaintiff's ADA claims for failure to accommodate and for wrongful discharge.

Plaintiff's FMLA Claim

Plaintiff also purports to bring a claim against Defendant for denial of her rights under the FMLA. Compl. ¶ 8. In support of this claim, Plaintiff alleges that "in December 2003 and January 2004, Defendant . . . denied Plaintiff additional Family and Medical Leave time" and "failed to allow Plaintiff to complete documents for Family and Medical Leave." Compl. ¶¶ 8(g) and 8(o). Plaintiff further alleges that "the aforementioned acts of the defendant denied plaintiff rights under the [FMLA]." Compl. ¶ 13. The FMLA entitles employees to take a total of twelve weeks of leave during a twelve-month period due to "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). It is well settled, however, that an employee who requests leave under the FMLA is not entitled to "any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave." 29 U.S.C. § 2614(a)(3)(B); *see also* 29 C.F.R. § 825.216(a) ("An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period."). In other words, the FMLA does not insulate employees from legitimate disciplinary action by the employer.

17

Here, Plaintiff did not submit her request for FMLA leave and the accompanying medical certification until January 9, 2004, which was four days after the City suspended her pending termination due to her chronic absenteeism and her resulting poor work performance. Plaintiff's request for FMLA leave was, therefore, not considered in the decision to terminate her since she did not make the request until after the termination process had already begun. Kureczka Aff. ¶ 18. Plaintiff's request for FMLA leave, submitted only after the City had suspended her, did not require the City to discontinue its termination proceedings against her or to afford her additional unpaid leave under the FMLA.[3] *See, e.g., Throneberry v. McGehee Desha County Hosp.*, 403 F.3d 972, 978 (8th Cir. 2005) (stating that "the FMLA's plain language and structure dictates that, if an employer were authorized to discharge an employee if the employee were not on FMLA leave, the FMLA does not shield an employee on FMLA leave from the same, lawful discharge"); *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 877 (10th Cir. 2004) (stating that "[i]f dismissal would have occurred regardless of the request for an FMLA leave, however, an

---

[3] Furthermore, the fact that Plaintiff has given contradictory reasons for needing leave during the period from December 10, 2003 until January 5, 2004, suggests to the court that she filed the untimely FMLA request specifically to stop the pending termination proceedings against her. For instance, Plaintiff testified in her deposition that she was absent from work from December 10, 2003, until January 5, 2004 (with the exception of December 22 and 23, days during which Plaintiff worked), because she had a viral infection. Pl.'s Dep. pp. 83-84. The medical certification that was submitted with her leave form on January 9, 2004, however, stated that she was requesting retroactive, intermittent leave because she had allergic rhinitis and asthma that caused coughing and that she had diabetes mellitus requiring regular office visits. Pl.'s Dep. pp. 109-110 & Def.'s Ex. 32.

18

employee may be dismissed even if dismissal prevents her exercise of her right to an FMLA leave"). In sum, Plaintiff has failed to raise a genuine issue of fact as to whether Defendant wrongfully denied her leave under the FMLA.

Alternatively, the court agrees with Defendant that Defendant was entitled to deny Plaintiffs' request for leave under the FMLA because she did not timely file her FMLA request. Plaintiff received the paperwork necessary to request FMLA leave on December 22, 2003. Pl.'s Dep. p. 87. This documentation included a form titled "Rights and Obligations under the Family and Medical Leave Act," which stated, among other things:

> An employee requesting FMLA leave due to his/her own serious health condition . . . is required to complete a Certification of Health Care Provider Form, (hereinafter certification) as provided in the handbook under sick leave and/or FMLA leave. Final approval of FMLA leave under these circumstances is contingent upon confirmation of eligibility and proper certification, and failure to provide such certification *within 15 days of receipt of the form may jeopardize an employee's FMLA rights.*

Pl.'s Dep. pp. 110-12 & p. 2 of Def.'s Ex. 32 (emphasis added). Thus, even if Plaintiff had not already been placed on suspension pending termination when she requested FMLA leave, Defendant was entitled to deny Plaintiff's request for FMLA leave in light of Plaintiff's untimely request.[4] *See Russell v. First Health Servs.*, 11

---

[4] Plaintiff admits that she did not submit her FMLA request and medical certification until January 9, 2004, which was 18 days after she received the FMLA packet on December 22, 2003. Plaintiff states, however, that she was late in giving notice of her FMLA request because her doctor was on vacation the week of December 22, 2003. Thus, she argues that the City could not deny her FMLA leave based on her untimely request since filing a timely request was not reasonably possible under her particular

19

Fed. Appx. 221, 222, 2001 WL 568037 (4th Cir. 2001) (unpublished) (holding that an employer did not violate the FMLA in firing an employee where the employee failed to timely provide information necessary to notify the employer that her leave might implicate the FMLA within the time required by the then-controlling regulations). In sum, Plaintiff fails to raise a genuine issue of fact as to whether Defendant violated her rights under the FMLA.

**CONCLUSION**

For the reasons stated herein, it is **RECOMMENDED** that Defendant's motion for summary judgment [docket no. 13] be **GRANTED** and that Plaintiff's claims be dismissed with prejudice.

_____
Wallace W. Dixon
United States Magistrate JudgeAu

August 5, 2005

Durham, NC

---

facts and circumstances. The court finds Plaintiff's excuse unpersuasive, as Plaintiff offers no reason why she could not have contacted her doctor when he returned from vacation the following week. Furthermore, Plaintiff had admitted that she was seen by her doctor on December 30, 2003, for "some sniffling," but offers no explanation as to why she did not have the doctor complete the FMLA certification on this date.

20